990 So.2d 831 (2008)
ALABAMA DEPARTMENT OF TRANSPORTATION; Joe McInnes, director of the Alabama Department of Transportation; and Governor Bob Riley
v.
HARBERT INTERNATIONAL, INC.
1050271.
Supreme Court of Alabama.
March 7, 2008.
*833 Troy King, atty. gen., Kevin C. Newsom, deputy atty. gen., and John J. Park, Jr., asst. atty. gen., for appellants.
*834 Steven L. Nicholas of Olen, Nicholas & Copeland, P.C., Mobile; and Douglas L. Patin of Bradley Arant Rose & White, Washington, D.C., for appellee.
SMITH, Justice.[1]
The Alabama Department of Transportation ("ALDOT"); Governor Bob Riley; and the director of ALDOT, Joe McInnes ("the director"), appeal from the judgment of the trial court in favor of Harbert International, Inc. ("Harbert"), in Harbert's action seeking declaratory and mandamus relief. We affirm in part, reverse in part, dismiss in part, and remand with directions.
In the early 1980s, ALDOT determined that the existing Cochrane Bridge over the Mobile River in Mobile needed to be replaced. A contract for the construction of a new bridge was awarded by ALDOT to S.J. Groves and Sons ("Groves"), and construction of the new bridge began in 1985. However, Groves ultimately defaulted in performing the contract, and ALDOT terminated the contract in 1988.
In 1989, ALDOT sought bids for contracts to finish the bridge. Harbert was awarded two contractsone for the completion of the main span of the bridge and a separate one for the completion of the elevated roadway approach spans (hereinafter referred to collectively as "the contract").
The main span of the bridge was designed as a "cable-stayed cantilever structure." The construction of such a bridge required segments of the span, called cantilevers, to be built out from opposite sides of vertical towers. These cantilevers are supported from the towers by "stay cables" that are placed under a predetermined amount of tension. The contract specified a procedure to install the stay cables and cantilevers called "balanced stay stressing," in which cables attached to opposing cantilevers on either side of the towers are put under tension simultaneously.
Special provision 398 of the contract provided that the balanced-stay-stressing procedure presented in the contact (referred to as an "erection sequence") was "not mandatory" and that Harbert could present a "totally different erection sequence" to be reviewed by ALDOT's "engineer." Harbert wanted to use a different erection-sequence procedure called "out-of-balance stay stressing" that was purportedly cheaper and more efficient. Harbert thus requested ALDOT to approve this alternative erection-sequence procedure.
In a letter dated November 14, 1989, ALDOT's bridge engineer, William Conway, notified Harbert that "the proposed construction scheme" for the main span was denied. Specifically, Conway indicated that the proposed procedure "violate[d] the contract requirement of Special Provision No. 396 and contract plans requirement that the ... stays be simultaneously stressed...." (Emphasis added.)[2] Construction of the bridge proceeded using the balanced-stay-stressing erection sequence.
The contract contained a provision that allowed ALDOT to assess liquidated damages for each day Harbert exceeded the time specified by the contract in which to complete the bridge. In early 1991, ALDOT began assessing liquidated damages at the rate of $2,000 per day for each *835 contract, totaling $4,000 per day. Although the construction work was not yet completed, in August 1991 the bridge opened for traffic, and ALDOT suspended the imposition of liquidated damages. However, on October 14, 1991, ALDOT again began imposing liquidated damages while Harbert finished the project. ALDOT ultimately stopped assessing these damages in February 1992.
During the course of the project, ALDOT made periodic payments to Harbert. Pursuant to a provision in the contract, ALDOT retained a portion of each payment, which is referred to in the record as "retainage." According to Harbert, ALDOT was required to pay this retainage to Harbert at the end of the project. However, ALDOT purportedly had not paid $291,750 of the retainage at the time of trial.[3]
Harbert alleges that during the project it was required to perform "extra work," i.e., work that was outside the scope of the project. The contract incorporated by reference certain procedures by which Harbert could request compensation for the extra work and also resolve any contract disputes with ALDOT. These procedures were specified in, among other places, a document referred to in the record as the "Standard Specifications," specifically, section 109.10 of the 1989 version of the Standard Specifications. That section provided, among other things, that claims by the contractorHarbertwould be initially evaluated by a "construction bureau"; if the contractor was unsatisfied with the construction bureau's evaluation, it could request a hearing before a "claims committee" made up of certain ALDOT employees who were not involved in the project. The claims committee would review the claims and issue a recommendation to the director regarding payment. If the contractor was still dissatisfied, it could request, at the discretion of the director, the formation of an advisory board to review the claims and to make another recommendation to the director, who would ultimately decide how much should be paid.
In 1992, Harbert submitted a claim under these procedures both for the "extra work" performed and also for expenses Harbert claimed it incurred based on the allegedly improper rejection by ALDOT's employee of the out-of-balance-stay-stressing erection procedure. Harbert maintained at trial that ALDOT and its director "disregarded" the claims-review process and instituted new procedures that were advantageous to ALDOT, including: appointing a person who had been involved in the project as a member of the claims committee; creating a second, "shadow claims committee" that supplied ex parte communications to the claims committee; denying Harbert the ability to rebut ALDOT's position before the claims committee; delaying resolution of Harbert's claims; failing to conduct a hearing on a "claim supplement" Harbert was required to provide; and failing to review "major aspects" of Harbert's claims, including whether the imposition of liquidated damages was wrongful and whether ALDOT failed to give proper consideration to the out-of-balance-stay-stressing erection sequence. Additionally, Harbert further contended that an advisory board was formed but disbanded before it could hear the claims and that the director made his decision regarding Harbert's claims without reviewing a recommendation by an advisory board.
*836 In May 1995, Harbert sued ALDOT and others in federal court. Those proceedings were ultimately dismissed. In November 2001, Harbert sued ALDOT and numerous employees of ALDOT, as well as the Governor and the director of ALDOT.[4] The complaint, which was subsequently amended, sought declarations that the defendants erroneously and unreasonably construed the contract to preclude out-of-balance stay stressing, that the liquidated damages constituted an unlawful penalty, that the defendants were under a legal duty to return all unlawful liquidated damages as well as the "retainage," and that Harbert was entitled to compensation for extra work performed under the contract. The complaint further alleged that the defendants violated Harbert's due-process rights in wrongfully administering both the contract and Harbert's claim for compensation for the extra work, that ALDOT officers misrepresented that Harbert could request alternate erection-sequence procedures and that the request would receive a good-faith review, and that the defendants engaged in an unlawful condemnation of Harbert's property. The complaint thus sought mandamus relief directing payment of the liquidated damages, the retainage, and compensation for the extra work Harbert performed. Alternately, the complaint sought a writ of mandamus to compel the defendants to give it a fair and impartial forum for Harbert to submit its claim for extra compensation.[5]
The case went to trial in August 2005. At the close of the evidence, Harbert moved for a judgment as a matter of law ("JML") as to counts II and III of the amended complaint, which sought payment of the retainage and liquidated damages. In an order dated September 14, 2005, the trial court granted the motion, stating:
"All funds being held by [ALDOT] as `Retainage' shall be released to [Harbert] and all funds assessed as `Liquidated Damages' after August 15, 1991 shall be paid over to [Harbert] forthwith.
"The Court hereby holds as a matter of law that `Liquidated Damages' assessed after August 15, 1991 are an illegal penalty and thus void under Alabama law. The sum of $534,000.00 plus interest from August 15, 1991 shall be paid over to [Harbert] by [ALDOT]. The Court will calculate interest in a separate order.
"The Court hereby holds as a matter of law that the `Retainage' is the property of [Harbert]. [ALDOT] is hereby ordered to pay said `Retainage' forthwith to [Harbert]."
The trial court then submitted the remaining claims to the jury. A verdict form with 18 special interrogatories was submitted to the jury. The trial court's final judgment, entered on the jury's verdict, held:
"This matter was tried before a jury commencing August 22, 2005. Without objection, the Court submitted the cause to the jury pursuant to Special Interrogatories, which were answered by the jury on September 15.... The Court informed the parties it intended to treat the jury's findings as advisory with respect to the equitable claims in this case, and the Court hereby renders the following Final Judgment upon Plaintiff Harbert International's causes of action:
". . . .

*837 "2. Count I of Harbert's Amended Complaint sought a declaration that Harbert's contracts with the State permitted Harbert to submit proposals for alternate construction methods including out-of-balance stay stressing and that the defendants' interpretation of those contracts was mistaken, unreasonable, and inconsistent with the express terms of the contract. The jury answered Special Interrogatories 1 and 2 relating to this issue in the affirmative. The Court accordingly enters judgment on Count I in favor of Harbert and against defendant Alabama Department of Transportation ('ALDOT') and Joe McInnes in his official capacity as Director of the Department of Transportation and Bob Riley in his official capacity as Governor, consistent with the jury's findings.
"3. Count II of Harbert's Amended Complaint sought a declaratory judgment that liquidated damages imposed by the State after August 15, 1991, when the Cochrane Bridge was opened to traffic, were an unlawful penalty and that Harbert was entitled to the return of such liquidated damages and also to the return of retainage that ALDOT continued to hold. At the close of the evidence, the Court granted Harbert's Motion for Judgment as a Matter of Law on this claim. See Order of September 14, 2005 (incorporated herein). The Court thus enters judgment on Count II in favor of Harbert and against defendants ALDOT, Joe McInnes in his official capacity as Director of the Department of Transportation, and Bob Riley in his official capacity as Governor, with respect to liquidated damages imposed after August 15, 1991 and with respect to retainage.
"4. Count III of Harbert's Amended Complaint seeks mandamus compelling the official-capacity defendants to return the liquidated damages and retainage that were the subject of Count II. The Court's Order of September 14, 2005 directs ALDOT to return the liquidated damages imposed after August 15, 1991 in the amount of $534,000.00, and also to return the retainage in the amount of $291,750.00 ALDOT continues to hold. Accordingly, the Court enters judgment on Count III in favor of Harbert and against ALDOT, Joe McInnes in his official capacity, and Bob Riley in his official capacity in accordance with the Order of September 14, 2005.
"5. Counts IV and VIII of Harbert's Amended Complaint seek relief for the taking of Harbert's property without just compensation in violation of Harbert's rights under Sections 13 and 23 of Article I of the Alabama Constitution of 1901. The jury answered Special Interrogatories 1, 2, 3, 5, 8, 9, 10, and 11, and 17 in the affirmative, which compels the finding that ALDOT put Harbert's property to a public use and failed to pay just compensation for that property, and further, acted arbitrarily, capriciously, in bad faith, beyond its authority, and under a mistaken interpretation of law. The jury determined the value of the property taken to be $2,350,000, and separately determined that Coastal Materials of Alabama, Inc. ('Coastal'), Harbert's subcontractor, was due $8,451. The jury also answered Special Interrogatories 7 and 13 in the negative. Accordingly, this Court enters judgment on Counts IV and VIII in favor of Harbert and against defendant ALDOT and the other official-capacity defendants, in the amount of $2,350,000.00, and in the amount of $8,451.00 on behalf of Coastal, plus interest and attorneys fees as provided for below....
"6. Count V of Harbert's amended complaint seeks mandamus directed to *838 Joe McInnes in his official capacity as Director of the Alabama Department of Transportation, and Bob Riley in his official capacity as Governor, directing them to pay the amount of Harbert's just claim for extra compensation made pursuant to the contracts between Harbert and the State. The jury found that ALDOT arbitrarily and capriciously interpreted the contracts during their administration; and further, that ALDOT failed to follow the claims process set out in the contracts, arbitrarily and capriciously failed to adequately review Harbert's claim, and arbitrarily and capriciously denied the claim. The court treats those findings as advisory only, but fully concurs in the jury's findings that the State acted arbitrarily, capriciously and wrongfully. The Court further finds that Harbert has exhausted its administrative remedies and that further efforts at review by defendants ALDOT and McInnes would be futile. Thus, mandamus may properly issue to the official capacity defendants to compel the proper exercise of their discretion and to pay the just amount of Harbert's claims. The jury determined the amount of Harbert's claim which was due to be paid was $2,350,000.00 and $8,451.00 on behalf of Coastal. The Court treats that finding as advisory, and independently determines the proper amount due on the claim to be $2,350,000.00 and $8,451.00 on behalf of Coastal. Accordingly, Joe McInnes in his official capacity, and Bob Riley in his official capacity, are ordered to pay Harbert $2,358,451.00 pursuant to its claim for extra compensation, plus interest as provided for below.
"7. Counts VI and VII of Harbert's Amended Complaint seek damages for fraudulent misrepresentation.... However, the jury also found that Harbert suffered no damages resulting from the misrepresentations....[6]
"8. Count IX of Harbert's Amended Complaint is moot in light of this judgment; however, the Court notes that Harbert would be entitled to said relief if for any reason this judgment was overturned. Harbert has withdrawn Count X.
". . . .
"Based on the foregoing, the Court enters judgment as follows:
"a. On Count III, in accordance with the Court's Order of September 14, 2005, and this Final Judgment the Court issues a mandamus directed to Joe McInnes in his official capacity as Director of the Alabama Department of Transportation, and Bob Riley in his official capacity as Governor to pay Harbert $1,277,646.00 in returned liquidated damages, interest and in returned retainage;
"b. On Count V, the Court issues a mandamus directed to Joe McInnes in his official capacity as Director of the Alabama Department of Transportation, and Bob Riley in his official capacity as Governor to pay Harbert $4,270,846.00;
"c. On Counts VI and VII, in accordance with the jury's answer to Special Interrogatories 15 and 16, the Court awards Harbert $0;
"d. On Counts IV and VIII the Court enters judgment for Harbert against ALDOT, Joe McInnes, in his official capacity as Director of the Alabama Department of Transportation, *839 and Bob Riley, in his official capacity as Governor in the amount of $4,270,846.00, plus pursuant to Alabama Code § 18-1A-32, the Court awards Harbert its litigation expenses of $552,747.00 for a total judgment of $4,823,593.00."
ALDOT, Governor Riley, and the director appeal.[7]

Discussion
The appellants argue that Harbert's action is barred by Article I, § 14, Alabama Constitution of 1901. Section 14 provides generally that the State of Alabama is immune from suit: "[T]he State of Alabama shall never be made a defendant in any court of law or equity." This constitutional provision "has been described as a `nearly impregnable' and `almost invincible' `wall' that provides the State an unwaivable, absolute immunity from suit in any court." Ex parte Town of Lowndesboro, 950 So.2d 1203, 1206 (Ala.2006). Section 14 "specifically prohibits the State from being made a party defendant in any suit at law or in equity." Hutchinson v. Board of Trs. of Univ. of Alabama, 288 Ala. 20, 23, 256 So.2d 281, 283 (1971). Additionally, under § 14, State agencies are "absolutely immune from suit." Lyons v. River Road Constr., Inc., 858 So.2d 257, 261 (Ala.2003).
Not only is the State immune from suit under § 14, but "[t]he State cannot be sued indirectly by suing an officer in his or her official capacity...." Lyons, 858 So.2d at 261. "Section 14 prohibits actions against state officers in their official capacities when those actions are, in effect, actions against the State." Haley v. Barbour County, 885 So.2d 783, 788 (Ala.2004). To determine whether an action against a State officer is, in fact, one against the State, this Court considers
"whether `a result favorable to the plaintiff would directly affect a contract or property right of the State,' Mitchell [v. Davis, 598 So.2d 801, 806 (Ala.1992) ], whether the defendant is simply a `conduit' through which the plaintiff seeks recovery of damages from the State, Barnes v. Dale, 530 So.2d 770, 784 (Ala. 1988), and whether `a judgment against the officer would directly affect the financial status of the State treasury,' Lyons [v. River Road Constr., Inc.], 858 So.2d [257] at 261 [ (Ala.2003) ]."
Haley, 885 So.2d at 788. Additionally, "[i]n determining whether an action against a state officer is barred by § 14, the Court considers the nature of the suit or the relief demanded, not the character of the office of the person against whom the suit is brought." Ex parte Carter, 395 So.2d 65, 67-68 (Ala.1980).
The immunity afforded State officers sued in their official capacities, however, is not unlimited:
"[Section 14] immunity from suit does not extend, in all instances, to officers of the State acting in their official capacity. Unzicker v. State, 346 So.2d 931 (Ala. 1977). In limited circumstances the writ of mandamus will lie to require action of state officials. This is true where discretion is exhausted and that which remains to be done is a ministerial act. See Hardin v. Fullilove Excavating Co., Inc., 353 So.2d 779 (Ala.1977); Tennessee & Coosa R.R. Co. v. Moore, 36 Ala. 371 (1860). Action may be enjoined if illegal, fraudulent, unauthorized, done in bad faith or under a mistaken interpretation of law. Wallace v. Board of Education of Montgomery Co., 280 Ala. 635, *840 197 So.2d 428 (1967). If judgment or discretion is abused, and exercised in an arbitrary or capricious manner, mandamus will lie to compel a proper exercise thereof. The writ will not lie to direct the manner of exercising discretion and neither will it lie to compel the performance of a duty in a certain manner where the performance of that duty rests upon an ascertainment of facts, or the existence of conditions, to be determined by an officer in his judgment or discretion. See Barnes v. State, 274 Ala. 705, 151 So.2d 619 (1963)."
McDowell-Purcell, Inc. v. Bass, 370 So.2d 942, 944 (Ala.1979).
Moreover, certain causes of action are not barred by § 14:
"`There are four general categories of actions which in Aland v. Graham, 287 Ala. 226, 250 So.2d 677 (1971), we stated do not come within the prohibition of § 14: (1) actions brought to compel State officials to perform their legal duties; (2) actions brought to enjoin State officials from enforcing an unconstitutional law; (3) actions to compel State officials to perform ministerial acts; and (4) actions brought under the Declaratory Judgments Act ... seeking construction of a statute and its application in a given situation. 287 Ala. at 229-230, 250 So.2d 677. Other actions which are not prohibited by § 14 are: (5) valid inverse condemnation actions brought against State officials in their representative capacity; and (6) actions for injunction or damages brought against State officials in their representative capacity and individually where it was alleged that they had acted fraudulently, in bad faith, beyond their authority or in a mistaken interpretation of law. Wallace v. Board of Education of Montgomery County, ... 280 Ala. [635] at 639, 197 So.2d 428 [ (1967) ]; Unzicker v. State, 346 So.2d 931, 933 (Ala.1977); Engelhardt v. Jenkins, 273 Ala. 352, 141 So.2d 193 (1962).'"
Drummond Co. v. Alabama Dep't of Transp., 937 So.2d 56, 58 (Ala.2006) (quoting Carter, 395 So.2d at 68) (emphasis omitted). These actions are sometimes referred to as "exceptions" to § 14; however, in actuality these actions are simply not considered to be actions "`against the State' for § 14 purposes." Patterson v. Gladwin Corp., 835 So.2d 137, 142 (Ala. 2002). This Court has qualified those "exceptions," noting that "`[a]n action is one against the [S]tate when a favorable result for the plaintiff would directly affect a contract or property right of the State, or would result in the plaintiff's recovery of money from the [S]tate.'" Alabama Agric. & Mech. Univ. v. Jones, 895 So.2d 867, 873 (Ala.2004) (quoting Shoals Cmty. Coll. v. Colagross, 674 So.2d 1311, 1314 (Ala.Civ.App.1995)) (emphasis added in Jones).
As a threshold issue, we must first determine whether ALDOT is properly a party in this case. ALDOT, as a State agency, is absolutely immune from suit. Ex parte Alabama Dep't of Transp., 978 So.2d 718, 721 (Ala.2007) ("ALDOT is a State agency ... and, therefore, is absolutely immune from suit...."). Generally, "any exceptions to that immunity extend only to suits naming the proper State official in his or her representative capacity." Ex parte Alabama Dep't of Transp., 978 So.2d 17, 22 (Ala.2007) (emphasis added). However, ALDOT is a named defendant in this case. This Court has recently noted that "[i]t may be argued that language from some of our cases would permit a declaratory-judgment action directly against the State or its agencies...." Id. at 25 n. 3.
As this Court held in Lowndesboro, "[t]he exception afforded declaratory-judgment *841 actions under § 14 generally applies only when the action seeks `construction of a statute and how it should be applied in a given situation,' Aland v. Graham, 287 Ala. 226, 230, 250 So.2d 677, 679 (1971), and not when an action seeks other relief." 950 So.2d at 1211. Early cases discussing the declaratory-judgment-action "exception" to § 14 describe the purpose of a declaratory-judgment action as giving direction and instruction to individual State officers on the interpretation and application of the law:
"In State v. Louis Pizitz Dry Goods Co., 243 Ala. 629, 633, 11 So.2d 342, 345 (1943), superseded, in part, on other grounds, Ala.Code 1940, tit. 7, § 167 (now Ala.Code 1975, § 6-6-221), we further explained why a declaratory-judgment action is not barred by § 14:
"`But we have held that when an officer of the State is confronted with an uncertain problem of what the law means which requires certain acts on his part, or whether the law is valid, and he proposes to pursue a certain course of conduct in that connection, which would injuriously affect the interests of others who contend that he has no legal right thus to act, there is thereby created a controversy between them and the Declaratory Judgments Act furnishes a remedy for either party against the other to declare the correct status of the law. The purpose is to settle a controversy between individuals, though some of them may be State officers.'
"See also Thurlow v. Berry, 247 Ala. 631, 639, 25 So.2d 726, 733 (1946) (`This court has declared the rule to be that when a suit against a state official seeks a declaration of applicable principles of law to a certain status and direction of the parties in the premises, it does not infringe Section 14, Constitution, or violate sovereign immunity.')."
Lowndesboro, 950 So.2d at 1211 n. 5. Subsequent cases, however, seemed to imply that this "exception" could allow an action against the State or a State agency. As one Justice of this Court recently noted:
"It is true that the opinion in the 1971 case of Aland v. Graham, 287 Ala. 226, 229-30, 250 So.2d 677, 679 (1971), quoted in Patterson v. Gladwin Corp., 835 So.2d 137, 142 (Ala.2002), ... was worded in such a way as to leave open the possibility that the exception for declaratory-judgment actions is not limited to actions against State officials. It is my conclusion, however, that cases such as Aland have not been careful in their articulation of this exception to sovereign immunity, particularly in light of the absolute immunity that it is now well established extends both to the State and to State agencies."
Main v. Raley, 987 So.2d 569, 583 (Ala. 2007) (Murdock, J., concurring in part and concurring in the result) (footnote omitted).
The purpose of the so-called "exception" to § 14 allowing declaratory-judgment actions is to give direction to State officers. Consistent with the other "exceptions" to § 14 immunity, we hold that only State officers named in their official capacity and not State agenciesmay be defendants in such proceedings. Therefore, the trial court did not have jurisdiction in the instant case to entertain an action or to enter a judgment against ALDOT, and ALDOT is due to be dismissed as a party. Therefore, as to ALDOT, the appeal is dismissed.

I.
The remaining appellants, the Governor and the director, argue that Harbert's claims against them are essentially claims against the State seeking money damages, *842 which they assert are barred by § 14. The Governor and the director further contend that Harbert has essentially "repackaged" its claims in an attempt to fit them within the "exceptions" to § 14. Nevertheless, the Governor and the director maintain that when considering the nature of the action and the relief awardedand not the labels placed on the claims by Harbertthe resulting judgment impacts the State in a manner barred by § 14.
As noted above, Harbert sought a writ of mandamus ordering the release of both the liquidated damages and the "retainage" reserved by ALDOT. The trial court's JML on counts II and III stated:
"The Court hereby holds as a matter of law that `Liquidated Damages' assessed after August 15, 1991 are an illegal penalty and thus void under Alabama law. The sum of $534,000.00 plus interest from August 15, 1991 shall be paid over to [Harbert] by [ALDOT]. The Court will calculate interest in a separate order.
"The Court hereby holds as a matter of law that the `Retainage' is the property of [Harbert]. [ALDOT] is hereby ordered to pay said `Retainage' forth-with to [Harbert]."
The trial court thus issued a writ of mandamus directing the Governor and the director to pay the liquidated damages and the retainage to Harbert. On appeal, the Governor and the director argue generally that this judgment is barred by § 14.
Generally, mandamus relief is available in certain situations to compel a State officer to perform the ministerial act of tendering payment of liquidated or certain sums the State is legally obligated to pay under a contract. State Highway Dep't v. Milton Constr. Co., 586 So.2d 872, 875 (Ala.1991); see also Jones, 895 So.2d at 877-79 (describing as "well-established [the] rule that a writ of mandamus will issue to compel payment of only such claims as are liquidated" and noting that prior caselaw had held "that payment for goods or services, for which the State had contracted and accepted, could be compelled by mandamus"); and State Bd. of Admin. v. Roquemore, 218 Ala. 120, 124, 117 So. 757, 760 (1928) ("the claim asserted [against the State was] for an amount fixed or determinable by the terms of the contract of sale," and was "definite and certain,... and not an unliquidated claim, in the sense that would render mandamus unavailable").
We find our opinions in Milton Construction Co. v. State Highway Department, 568 So.2d 784 (Ala.1990) ("Milton I"), and State Highway Department v. Milton Construction Co., 586 So.2d 872 (Ala.1991) ("Milton II"), dispositive on this issue. In Milton I, the plaintiff, Milton Construction Company, asked the trial court to declare the disincentive clause of an "incentive/disincentive-payments provision" in two highway-construction contracts it had entered into with ALDOT (then called "the Highway Department") void and unenforceable as a penalty. Milton Construction further asked the trial court to order the defendantsthe State, ALDOT, and ALDOT's directorto pay it the amounts of "disincentive payments" ALDOT had allegedly wrongfully withheld. On appeal, this Court held that the "disincentive clause" in the contracts was "void as a penalty and therefore unenforceable," 568 So.2d at 791, and remanded the case.
On return to remand, the defendants claimed that § 14 barred the trial court from ordering them to pay the money they had withheld from Milton Construction under the void disincentive clause. In Milton II, this Court disagreed, stating:

*843 "It is true that § 14 of the Constitution prevents a suit against the state as well as suits against its agencies. See Phillips v. Thomas, 555 So.2d 81 (Ala. 1989); Rutledge v. Baldwin County Comm'n, 495 So.2d 49 (Ala.1986). However, this Court has also recognized that there are certain established exceptions to the protection afforded the state or its agencies by sovereign immunity. See Ex parte Carter, 395 So.2d 65, 68 (Ala.1981). Among those recognized exceptions are actions brought to force state employees or agencies to perform their legal duties. Id. See also Nix and Vercelli, Immunities Available In Alabama For Cities, Counties And Other Governmental Entities, And Their Officials, 13 Am. J. Trial Advoc. 615 (1989).
"... Once the Highway Department has legally contracted under state law for goods or services and accepts such goods or services, the Highway Department also becomes legally obligated to pay for the goods or services accepted in accordance with the terms of the contract. It follows that this obligation is not subject to the doctrine of sovereign immunity and is enforceable in the courts. See, e.g., Gunter v. Beasley, 414 So.2d 41 (Ala.1982); State Board of Administration v. Roquemore, 218 Ala. 120, 117 So. 757 (1928).
"It is undisputed that Milton Construction has already rendered the services called for under the contract. Consequently, we hold that this lawsuit is not barred by the doctrine of sovereign immunity, because it is in the nature of an action to compel state officers to perform their legal duties and pay Milton Construction for services contracted for and rendered. Gunter, supra; Roquemore, supra.
"For example, in Roquemore the Highway Department contracted with Roquemore to purchase hay. After Roquemore had delivered a substantial amount of hay to the Highway Department, it refused to accept any further deliveries of hay and refused to pay for the hay that it had already received. Roquemore petitioned this Court for a writ of mandamus ordering the State Board of Administration and the Highway Department to pay him for the hay that he had delivered. This Court held that the writ was proper and was not barred by the doctrine of sovereign immunity because, under the applicable statutes, the Highway Department could not refuse to pay for goods that it had already accepted. This Court held that the suit in Roquemore was one to force a state agency to perform its legal duty, i.e., to force the Highway Department to pay for the hay that it had already accepted. Likewise, in this case, Milton Construction's action against the Highway Department is not barred by the doctrine of sovereign immunity."
Milton II, 586 So.2d at 875. This Court thus upheld the trial court's judgment holding that the moneys withheld under the disincentive clause were due to be paid to Milton Construction.
Like the plaintiff in Milton I and Milton II, Harbert contended that a provision in a contract with ALDOT was void as a penalty. Harbert thus sought mandamus relief directing that State officers pay the funds withheld by ALDOT. The trial court agreed and, like the trial court in Milton II, ordered that the withheld funds be paid. In their initial brief on appeal, the Governor and the director do not appear to contest the trial court's holding that the liquidated-damages provision was unlawfully applied in this case. Thus, under the authority of Milton II, the trial court's mandamus relief directing that the funds withheld as liquidated damages are due to be returned to Harbert is affirmed. See *844 Hardin v. Fullilove Excavating Co., 353 So.2d 779, 783 (Ala.1977) (agreeing with the trial court's factual findings and legal conclusions interpreting a contract between a State agency and a contractor "as calling for payment of the disputed sum" and affirming the issuance of the writ of mandamus to compel State officers to tender payment). Additionally, the Governor and the director do not properly present an argument as to how ALDOT is legally entitled to the funds withheld from Harbert as retainage. For all that appears, the trial court correctly held that the funds were to be paid to Harbert. Therefore, the trial court's mandamus relief also directing the retainage to be paid to Harbert is due to be affirmed.

II.
The trial court's judgment on counts I, IV, V, and VIII, however, requires a different analysis. These counts, in essence, seek unliquidated damages for, among other things, the defendants' alleged failure to properly consider the proposed erection sequence and the claim for compensation for extra work performed.[8] Additionally, count VIII purported to allege a cause of action for inverse condemnation.[9] The Governor and the director contend that despite Harbert's efforts to characterize these claims as falling within the purported "exceptions" to § 14, they are, in effect, in the nature of claims seeking damages for breach of contract, which is forbidden under § 14. We agree.
As noted above, this Court has upheld actions that seek relief in the form of compelling State officers to properly exercise their discretion or judgment when it is alleged that the State officers have abused that discretion or judgment or exercised them in an arbitrary manner. McDowell-Purcell, Inc., 370 So.2d at 944 ("In limited circumstances the writ of mandamus will lie to require action of state officials.... If judgment or discretion is abused, and exercised in an arbitrary or capricious manner, mandamus will lie to compel a proper exercise thereof."). However, in this case, the assessment of damages against the State officers named in their official capacities divests the treasury of funds in manner that is prohibited by § 14. In Stark v. Troy State University, 514 So.2d 46 (Ala.1987), the plaintiff, an employee of a State university, sued certain State officers employed by the university, *845 arguing that they had violated the university's policies in underpaying him during a prior academic year. He thus sought damages for back pay. The defendants argued that the action was barred by § 14. We stated:
"Based on the foregoing, if the individual defendants have not acted toward the plaintiff in accordance with the rules and regulations set by the university, their acts are arbitrary and an action seeking to compel them to perform their legal duties will not be barred by the sovereign immunity clause of the Alabama Constitution of 1901; however, the action for compensatory damages cannot be maintained. The reason was stated in Gunter v. Beasley, 414 So.2d 41 (Ala.1982):
"`Section 14 prohibits the State from being made a defendant in any court of this state and neither the State nor any individual can consent to a suit against the State. Aland v. Graham, 287 Ala. 226, 250 So.2d 677 (1971). The application of Section 14 to suits against officers of the State was treated in Ex parte Carter, 395 So.2d 65 (Ala.1980), as follows:
"`"... In determining whether an action against a state officer is barred by § 14, the Court considers the nature of the suit or the relief demanded, not the character of the office of the person against whom the suit is brought. Wallace v. Board of Education of Montgomery County, 280 Ala. 635, 197 So.2d 428 (1967). This Court has held that § 14 prohibits suit against State officers and agents in their official capacity or individually when a result favorable to the plaintiff would directly affect a contract or property right of the State. Southall v. Stricos Corp., 275 Ala. 156, 153 So.2d 234 (1963)."' (Emphasis added.)
"414 So.2d at 48."
514 So.2d at 50-51.
Furthermore, in Vaughan v. Sibley, 709 So.2d 482 (Ala.Civ.App.1997), an employee of the University of Alabama at Birmingham ("UAB") sued various UAB officials seeking back pay and an order requiring the enforcement of UAB's salary policies. The university's officers argued that § 14 barred the action, and the trial court agreed.
On appeal, the Court of Civil Appeals concluded that insofar as the plaintiff requested relief ordering the defendants to follow the salary policy in the future, § 14 did not bar the action. 709 So.2d at 485. However, the plaintiff was not entitled to retrospective relief in the form of back pay: "Because of the sovereign immunity clause, the courts of this state are without jurisdiction to entertain a suit seeking damages, including back pay, for breach of contract against the state." 709 So.2d at 486. See also Williams v. Hank's Ambulance Serv., Inc., 699 So.2d 1230, 1232 (Ala.1997) (holding that a judgment requiring reimbursement from the State for services provided, which payment had been withheld under the State's erroneous interpretation of federal statutes, would directly affect a property right of the State and, therefore, was barred by § 14).
As illustrated in Part I of this opinion, the trial court can generally, by writ of mandamus, order State officers in certain situations to pay liquidated damages or contractually specified debts. The payment of these certain, liquidated amounts would be only a ministerial act that State officers do not have the discretion to avoid. Jones, 895 So.2d at 878-79; Roquemore, 218 Ala. at 124, 117 So. at 760. Furthermore, although the payment of the funds "may ultimately touch the State treasury," Horn v. Dunn Bros., 262 Ala. *846 404, 410, 79 So.2d 11, 17 (1955), the payment does not "affect the financial status of the State treasury," Lyons, 858 So.2d at 261, because the funds "do not belong to the State," Alabama Dep't of Envtl. Mgmt. v. Lowndesboro, 950 So.2d 1180, 1190 n. 6 (Ala.Civ.App.2005) (two-judge opinion), and the State treasury "suffers no more than it would" had the State officers originally performed their duties and paid the debts. Horn, 262 Ala. at 410, 79 So.2d at 17. The trial court may not, however, award retroactive relief in the nature of unliquidated damages or compensatory damages, because such relief affects a property or contract right of the State. Stark; Williams; Roquemore; J.B. McCrary Co. v. Brunson, 204 Ala. 85, 86, 85 So. 396, 396 (1920) ("mandamus will not lie to compel the payment of unliquidated claims"); and Vaughan. Therefore, under § 14 the trial court was without jurisdiction to enter a judgment or to direct the Governor and the director to pay on counts I, IV, V, and VIII, and those counts are due to be dismissed.[10]
Although the trial court cannot award compensatory damages or unliquidated damages in this case, the trial court does have the ability to compel State officers who are acting arbitrarily and capriciously to properly perform their duties. Stark, 514 So.2d at 50 (holding that an action seeking to compel State officers who are acting arbitrarily to perform their legal duties "will not be barred by the sovereign immunity clause of the Alabama Constitution of 1901"); McDowell-Purcell, 370 So.2d at 944 ("If judgment or discretion is abused, and exercised in an arbitrary or capricious manner, mandamus will lie to compel a proper exercise thereof."); St. Clair County v. Town of Riverside, 272 Ala. 294, 296, 128 So.2d 333, 334 (1961) ("Injunctive action may be maintained against a state official, if the official is acting beyond the scope of his authority or acting illegally, in bad faith, or fraudulently."). Count IX of the complaint sought a writ of mandamus to compel the defendants to provide a fair and impartial process in which Harbert could submit its claims. The trial court held that count IX was moot in light of its judgment but that Harbert would be entitled to relief under that count should the judgment be reversed on appeal. We therefore remand the cause for the trial court to rule on count IX.[11]

Conclusion
The trial court's judgment insofar as it ordered ALDOT to pay damages is void because that court lacked jurisdiction as to ALDOT, and, as to ALDOT, the appeal is dismissed. Furthermore, the judgment as to counts I, IV, V, and VIII, directing the State to pay damages to Harbert, is due to be dismissed. The trial court's judgment *847 is reversed insofar as it holds that count IX is moot; because of our holding as to counts I, IV, V, and VIII, the question whether the claims procedure was fair and impartial is no longer moot. The remainder of the judgment, including the order to pay Harbert the liquidated damages and retainage, is affirmed. The case is remanded for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; APPEAL DISMISSED IN PART; AND REMANDED WITH DIRECTIONS.
COBB, C.J., and SEE, WOODALL, STUART, BOLIN, and PARKER, JJ., concur.
MURDOCK, J., concurs specially.
LYONS, J., recuses himself.
MURDOCK, Justice (concurring specially).
I begin by noting my agreement with the conclusion in the main opinion that the so-called "exception" to State immunity for declaratory-judgment actions does not extend to State agencies. See 990 So.2d at 841. I write separately (a) to affirm my understanding of certain principles relating to State immunity and the "exceptions" thereto, and (b) to explain that, in the particular circumstances presented in this case, especially the limited nature of the arguments made by the State defendants as to the issues of liquidated damages and retainage, I do not read the main opinion as inconsistent with my understanding of these principles.

A. General Principles
The above-referenced declaratory-judgment exception to immunity is one of six exceptions that have been recognized:
"`A state official is not immune from an action that (1) seeks to compel a state official to perform his or her legal duties, (2) seeks to enjoin a state official from enforcing unconstitutional laws, (3) seeks to compel a state official to perform ministerial acts, or (4) seeks a declaration under the Declaratory Judgments Act, § 6-6-220 et seq., Ala.Code 1975, construing a statute and applying it in a given situation.'
"Latham v. Department of Corr., 927 So.2d 815, 821 (Ala.2005). Other actions that are not prohibited by § 14 include:
"`(5) valid inverse condemnation actions brought against State officials in their representative capacity; and (6) actions for injunction or damages brought against State officials in their representative capacity and individually where it was alleged that they had acted fraudulently, in bad faith, beyond their authority or in a mistaken interpretation of law.'
"Drummond Co. [v. Alabama Dep't of Transp.], 937 So.2d [56,] 58 [ (Ala.2006) ] (emphasis omitted)."
Ex parte Alabama Dep't of Transp., 978 So.2d 17, 21 (Ala.2007) (footnote omitted).
As the main opinion correctly notes, however, this Court has qualified the foregoing "exceptions," as follows: "`"[a]n action is one against the [S]tate when a favorable result for the plaintiff would directly affect a contract or property right of the State, or would result in the plaintiff's recovery of money from the [S]tate."'" 990 So.2d at 840 (quoting Alabama Agric. & Mech. Univ. v. Jones, 895 So.2d 867, 873 (Ala.2004), quoting in turn Shoals Cmty. Coll. v. Colagross, 674 So.2d 1311, 1314 (Ala.Civ.App.1995) (emphasis added in Jones)). This Court stated in Haley v. Barbour County, 885 So.2d 783, 788 (Ala. 2004), that, to determine whether an action against a State officer is, in fact, one against the State, a court must consider

*848 "whether `a result favorable to the plaintiff would directly affect a contract or property right of the State,' Mitchell [v. Davis,] 598 So.2d [801,] 806, [(Ala. 1992) ], whether the defendant is simply a `conduit' through which the plaintiff seeks recovery of damages from the State, Barnes v. Dale, 530 So.2d 770, 784 (Ala.1988), and whether `a judgment against the officer would directly affect the financial status of the State treasury,' Lyons [v. River Road Constr., Inc.], 858 So.2d [257,] 261 [ (Ala.2003) ]."

B. Application of General Principles in the Present Case, Particularly as to Liquidated Damages and Retainage
At first glance, it would appear that Harbert's recovery in this case of liquidated damages and retainage "would directly affect a contract ... right of the State," Mitchell v. Davis, 598 So.2d 801, 806 (Ala.1992), "`would result in the plaintiff's recovery of money from the [S]tate,'" Jones, 895 So.2d at 873, and "would directly affect the financial status of the State treasury," Lyons v. River Road Constr., Inc., 858 So.2d 257, 261 (Ala.2003). The main opinion overcomes this apparent obstacle, however, with the following reasoning:
"Generally, mandamus relief is available in certain situations to compel a State officer to perform the ministerial act of tendering payment of liquidated or certain sums the State is legally obligated to pay under a contract. State Highway Dep't v. Milton Constr. Co., 586 So.2d 872, 875 (Ala.1991) [ (`Milton II') ]; see also [Alabama Agric. & Mech. Univ. v.] Jones, 895 So.2d [867] at 877-79 [ (Ala.2004) ] (describing as `well-established [the] rule that a writ of mandamus will issue to compel payment of only such claims as are liquidated' and noting that prior caselaw had held `that payment for goods or services, for which the State had contracted and accepted, could be compelled by mandamus'); and State Bd. of Admin. v. Roquemore, 218 Ala. 120, 124, 117 So. 757, 760 (1928) ('the claim asserted [against the State was] for an amount fixed or determinable by the terms of the contract of sale,' and was `definite and certain, ... and not an unliquidated claim, in the sense that would render mandamus unavailable')."
990 So.2d at 842 (emphasis in first sentence added).
As a threshold matter, I do not read the foregoing passage, and particularly its reference to the availability of mandamus relief, as in any way altering the above-quoted principles regarding § 14 immunity. Those principles apply regardless of whether the vehicle used by a plaintiff is an action at law (e.g., an action alleging breach of contract or negligence) or an action in equity, including, for example, a petition for a writ of mandamus. This Court has never held that there is one set of "exceptions" to § 14 immunity in actions generally and some other, special, set of "exceptions" uniquely applicable to petitions for the writ of mandamus. Such cases as Jones and McDowell-Purcell, Inc. v. Bass, 370 So.2d 942, 944 (Ala.1979), both of which sought writs of mandamus, bear this out. Further, the reference to ministerial acts in the first sentence reflects the third of the numbered exceptions to State immunity, as quoted above.[12]
*849 Having said that, it becomes critical, I think, to recognize that the reference in the cases cited in the above-quoted passage from the main opinion to claims that are "liquidated," when considered in context, are references not merely to claims for amounts that have been reduced to sums certain, but claims as to which there is no room for dispute as to liability, i.e., whether the amounts at issue are owed.[13]
In this regard, Part III.B. of the Jones opinion, titled "Mandamus," is particularly instructive. The Jones Court parses the holdings in State Board of Administration v. Roquemore, 218 Ala. 120, 117 So. 757 (1928); Dampier v. Pegues, 362 So.2d 224 (Ala.1978); Hardin v. Fullilove Excavating Co., 353 So.2d 779 (Ala.1977); and State of Alabama Highway Department v. Milton Construction Co., 586 So.2d 872 (Ala.1991) ("Milton II"), most of which are relied upon by the main opinion in the present case.
As to Dampier, the Jones Court noted that that case arose out of an action "seeking a writ of mandamus to require [certain State officials] to pay [Dampier] $14,325.66 allegedly due under a contract." 895 So.2d at 878. The Jones Court explained that, taking the allegations of the complaint as true in the context of a motion to dismiss, the case before it was one in which the services at issue "[had been] accepted, approved and used by the [State]." 895 So.2d at 878.
"Similarly," according to the Jones Court, the issue in Hardin "was whether, `[a]fter approval of final payment, including the sum of $15,413.76, [the State officials could] interpret, or reinterpret, the contract and specifications and rescind prior approval of payment'" under a construction contract. 895 So.2d at 879. "Without discussing § 14 expressly, the [Hardin] Court explained: `In this case the discretion of [the State officials] was exhausted, at the very latest, when approval was given Fullilove's final payment request....'" 895 So.2d at 879 (emphasis *850 omitted) (quoting Hardin, 353 So.2d at 784).[14]
The Jones Court then turned its attention to a case that, like the present case, involved an action by a contractor against the director of the Alabama Highway Department seeking to recover moneys allegedly owed under a construction contract. Quoting from this Court's opinion in McDowell-Purcell, 370 So.2d at 944, the Jones Court reiterated:

"`In limited circumstances the writ of mandamus will lie to require action of state officials. This is true where discretion is exhausted and that which remains to be done is a ministerial act. See Hardin v. Fullilove Excavating Co., Inc., 353 So.2d 779 (Ala.1977).... The writ will not lie to direct the manner of exercising discretion and neither will it lie to compel the performance of a duty in a certain manner where the performance of that duty rests upon an ascertainment of facts, or the existence of conditions, to be determined by an officer in his judgment or discretion....
"`....
"`[Purcell] contends that because the required rock bolting has been completed and accepted [emphasis in original] by ... Bass, all that remains is for Bass to perform a ministerial act: paying [Purcell] for all rock bolting at four dollars per linear foot. Were one other circumstance present we would be compelled to agree. The payment request for the rock bolting ... has never been approved [emphasis in original] by the Highway Department. Had it been, mandamus would lie because all that would remain would be for Bass to make payment. See Dampier v. Pegues, 362 So.2d 224 (Ala.1978); Hardin v. Fullilove Excavating Co., Inc., 353 So.2d 779 (Ala.1977).'"
895 So.2d at 880 (emphasis in first two sentences added). The Jones Court noted that the contractor in McDowell-Purcell "`had constructive notice that it could not sue the State over a contract dispute. Section 14, Const. 1901....'" 895 So.2d at 880 (quoting McDowell-Purcell, 370 So.2d at 944).
"`In this case [the director of ALDOT] had a duty to either approve or disapprove payment according to one of two different interpretations of the contract. Performance of that duty rested upon his judgmental or discretionary ascertainment of facts or existence of conditions to be applied under the terms of the contract. The writ of mandamus will not lie to compel him to exercise his discretion and apply the ascertained facts or existing conditions under the contract so as to approve payment to [Purcell] according to its interpretation of the contract rather than his.'"
*851 Jones, 895 at 880-81 (quoting McDowell-Purcell, 370 So.2d at 944) (emphasis added in Jones).
The Jones Court then concluded its analysis as follows:
"Thus, in Roquemore, Hardin, and Dampier, the writ of mandamus issued, as McDowell-Purcell explains, only after the discretion of state officials had been exhausted. Consequently, mandamus was, in those cases, an available remedy to compel state agents to perform the essentially ministerial act of rendering payment for goods or services accepted. Cf. State of Alabama Highway Dep't v. Milton Constr. Co., 586 So.2d 872 (Ala.1991) (State Highway Department had no right to withhold payment from a construction company under a contractual clause held in an earlier opinion by this Court to be a void penalty provision)."[15]
Jones, 895 So.2d at 881 (emphasis added).
Although the State defendants' brief to this Court agrees with the foregoing analysis as to the meaning of "liquidated" claims in the above-discussed cases, it does so in the context of arguments relating to the dispute over the extra work for which the jury returned a $2,350,000 verdict in Harbert's favor. The State defendants make essentially no argument in their briefs to this Court specifically contesting that portion of the trial court's judgment requiring the State defendants to pay to Harbert amounts equal to the liquidated damages withheld after August 15, 1991, and the retainage.
As to the liquidated damages, the State defendants' brief provides this Court with no argument (although a portion of the State defendants' "Statement of Facts" suggests one) as to whether, how, or to what extent the State defendants took the position in the trial court that the State's alleged obligations were disputed, i.e., that the State's discretion as to those obligations was not exhausted (in the same manner the State's discretion was not exhausted in Jones, supra, and McDowell-Purcell, supra), rather than obligations of an essentially ministerial nature like those in Milton II (see n. 15, supra) and Roquemore, Hardin, and Dampier. Further, it may well be that Milton II is distinguishable on the ground set out in note 15, supra; the State defendants do not make this argument, however.[16]
*852 Similarly, the brief of the State defendants does not offer an explanation as to whether, how, or to what extent the State defendants challenged at trial their alleged obligation to pay the retainage to Harbert as distinguishable from the ministerial obligation of the State to pay for those goods or services contracted for, "accepted," and "approved" in Roquemore, Hardin, and Dampier. Nor do they ask us to overrule those decisions.
Because under the arguments and circumstances presented in this case I do not read the main opinion as inconsistent with the general principles discussed herein, I concur in that opinion.
NOTES
[1] This case was originally assigned to another Justice; it was reassigned to Justice Smith.
[2] Harbert argues that ALDOT employees misunderstood the nature of the proposed erection-sequence procedure and that they did not get "meaningful" outside input into the viability of the proposed change in the erection sequence.
[3] Harbert contended that ALDOT withheld the liquidated damages and retainage as a "bargaining chip" in negotiations with Harbert over compensation for other work Harbert performed for ALDOT in conjunction with the bridge project.
[4] Subsequent changes in administrations have resulted in Governor Riley and Director McInnes being substituted as parties. See Rule 25(d), Ala. R. Civ. P.
[5] Count X alleged that the defendants were estopped from denying Harbert's claims for "just compensation"; Harbert dismissed count X during trial.
[6] A judgment was entered on counts VI and VII in favor of the defendants; that part of the judgment is not challenged on appeal.
[7] The trial court did not render a judgment against the individually named ALDOT employees; they are not parties to this appeal.
[8] Count I sought a declaration that the contract permitted Harbert to submit alternate erection procedures and that the defendants' interpretation of the contract on this issue was incorrect. Count IV alleged that the defendants acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, and under a mistaken interpretation of the law by rejecting the proposed erection sequence, and that they willfully and in bad faith failed to provide a proper claims process.

As to count V, the complaint alleged that all the individual defendants in their official capacities were under a legal duty to pay Harbert's claims for "extra compensation." The trial court found that "the State" had acted arbitrarily and capriciously in interpreting the contract and in failing to follow the claims process.
[9] "Inverse condemnation is defined as the taking of private property for public use without formal condemnation proceedings and without just compensation being paid by a governmental agency or entity which has the right or power of condemnation." Carter, 395 So.2d at 67. The specific facts of this case do not reveal an attempt to take property for public use without the formalities of a condemnation proceeding. Instead, Harbert's claim for inverse-condemnation damages is essentially a claim that the defendants violated the duties and obligations of the contract, which resulted in the taking of Harbert's labor, materials, and services. This claim, in substance, is actually a claim that ALDOT breached its contract with Harbert, resulting in damage to Harbert.
[10] The Governor and the director also contend that the trial court erred in allowing certain evidence to be admitted at trial and in calculating the amount of the final award. No authority is cited in support of these arguments; therefore, there is nothing for this Court to review on these issues. See Jimmy Day Plumbing & Heating, Inc. v. Smith, 964 So.2d 1 (Ala.2007).
[11] Harbert argues that the previous claims-review process was futile because of the actions of the defendants. Should the trial court find in favor of Harbert on count IX and order the Governor and the director to provide a fair forum in which Harbert can present its claims for extra compensation, the trial court may use its inherent powers to enforce that judgment, subject, of course, to the limitations of § 14. See Cherry v. Mazzone, 568 So.2d 799, 804 (Ala. 1990) (stating that courts "have the inherent power" to enforce their judgments and to make such orders as necessary to render the judgments effective); but see also Haley, 885 So.2d at 788-89 (holding that the trial court's attempt to compel compliance with its judgment through monetary sanctions violated § 14).
[12] I also note that, when a State official fails to perform a ministerial task, the official has provided the "arbitrary" action, or the "abuse of discretion," to which our cases sometimes refer as a basis for the issuance of a writ of mandamus. See 990 So.2d at 844, citing McDowell-Purcell, 370 So.2d at 944, and Stark v. Troy State Univ., 514 So.2d 46, 50-51 (Ala. 1987).
[13] There is also potential for confusion over a third manner in which the term "liquidated" appears in this case. Under the terms of the Harbert contracts with the State, "liquidated damages" are the amounts the contracts define as payable to the State (or deductible from the amounts owed to Harbert) in the event Harbert is responsible for a delay in the performance of its contractual obligations. As discussed in the main text of this writing, however, such contractually defined "liquidated damages" for late performance, though of a sum certain, are not necessarily undisputed amounts owed to the State within the contemplation of this Court's opinion in cases such as Jones, McDowell-Purcell, and even State Highway Dep't v. Milton Constr. Co., 586 So.2d 872 (Ala.1991). To the contrary, whether a contractor is late in performing construction or should be charged with responsibility for the alleged late performance could well be, and frequently is, the subject of dispute in a given case. Likewise, a given case could involve a dispute as to whether a contractor is entitled to be paid the retainage provided for in its contract with the State, even if the amount of that retainage is a sum certain. See, e.g., J.L. Simmons Co. v. Capital Dev. Bd., 98 Ill.App.3d 445, 424 N.E.2d 821, 54 Ill.Dec. 71 (1981) (holding that state principles of sovereign immunity required a contractor's suit for the recovery of retainage under its construction contract with a state board to be brought in the Illinois Court of Claims). In such cases, I would not be able to agree with a statement, such as that found in Part II of the main opinion, that a judgment against the State would not directly affect the treasury of the State. In the present case, however, I read that statement in the context of the circumstances presented. As discussed in more detail in the main text of this writing, infra, those circumstances include the fact that the appellants have not provided this Court with an argument as to why the trial court's treatment of the State's obligations with respect to the liquidated damages and retainage is in error. For purposes of this case, therefore, we are left to consider those alleged obligations no differently than if they were in fact ministerial obligations of the State.
[14] In Jones, the Court also discussed Vaughan v. Sibley, 709 So.2d 482 (Ala.Civ.App.1997), in which a professor at the University of Alabama at Birmingham sought to recover back pay. The Jones Court quoted with approval from the Court of Civil Appeals' opinion, noting that the professor's "`remedy, if any, is with the Board of Adjustment.'" 895 So.2d at 874 (quoting Vaughan, 709 So.2d at 486). After quoting §§ 41-9-62(a)(4) and (a)(7), Ala. Code 1975, providing for claims against the State of Alabama to be heard by the Board of Adjustment, the Jones Court, quoting Vaughan, 709 So.2d at 486, stated:

"`The Board of Adjustment has jurisdiction over claims against the state that are not justiciable in the courts because of the state's constitutional immunity from being made a defendant. Lee v. Cunningham, 234 Ala. 639, 641, 176 So. 477 (1937). The Board of Adjustment has exclusive jurisdiction over a contract claim against a state university. Alabama State University v. State Bd. of Adjustment, 541 So.2d 567 (Ala. Civ.App.1989).'"
895 So.2d at 874.
[15] Consistent with this parenthetical explanation by the Jones Court of the holding in Milton II, it would appear that the contractor in Milton II was able to recover only because of the unique procedural posture of that case. It is a case in which an earlier appeal, in which the issue of sovereign immunity was not raised or discussed, resulted in a holding that a contractual provision requiring certain compensation to the State for late performance by the contractor of its construction obligations was void as a penalty. Milton Constr. Co. v. State Highway Dep't, 568 So.2d 784 (Ala. 1990) ("Milton I"). That holding became the law of the case insofar as Milton II was concerned and, as a result, the State officials had no discretion in the context of Milton II to dispute that the amount in question was due to be refunded. The refunding of that amount essentially became a ministerial act after the decision in Milton I. See also, e.g., Horn v. Dunn Bros., 262 Ala. 404, 409-10, 79 So.2d 11, 16-17 (1955) ("The decree of 29 February 1952, established the taxpayer's right to a refund for taxes paid on interstate operations. All that remained to be done by the State Department of Revenue was the computation of such refund and the necessary certification to the comptroller. At leas[t], to that extent, the duties of the Commissioner were ministerial only."; disagreeing with the position of the commissioner that he had some discretion in the matter and was not governed by a "clear, legal duty under the circumstances.").
[16] Nor do the State defendants ask this Court to overrule Milton I and Milton II as inconsistent with other decisions of this Court both before and since those cases were decided.